UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Sergey Giter as Personal Representative of the
Estate of Klavdia Giter, deceased,

      Plaintiff,

vs.                                                   Case No. 3:08-cv-622-J-MCR

United States of America,

      Defendant.
_____/

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This action for damages under the Federal Torts Claim Act came before the Court for a bench trial on December 9 and 10, 2009. After reviewing the parties' proposed findings of fact and conclusions of law and their trial briefs, the Court is now prepared to decide the case.

### **I. Background**

Plaintiff, Sergey Giter, as personal representative of the estate of his deceased mother, Klavdia Giter, brought this action pursuant to the Federal Torts Claim Act after his mother was killed when a vehicle driven by a sailor in the United States Navy hit her. Plaintiff argues the driver of the vehicle, George E. Lett, was negligently operating the vehicle at the time of the accident. Defendant, the United States of America, similarly claims Ms. Giter was negligent by being in the road, outside of a crosswalk, when the accident occurred. Defendant filed a Motion for Summary Judgment (Doc. 15), which Judge Adams denied on October 29, 2009. (Doc. 27). Thereafter, the parties

consented to have the undersigned conduct the trial of the case. The non-jury trial was held on December 9 and 10, 2009.

## II. Findings of Fact

In the early morning hours of August 24, 2006, Petty Officer George E. Lett ("Lett"), a sailor in the United States Navy, was leaving a sleep clinic located on University Boulevard in Jacksonville, Florida. (Tr. 1, 8:3-23).[1] Lett was stationed in Guantanamo, Cuba, but was sent to Jacksonville to undergo medical tests. (Tr. 1, 6:6-25, 7:1-12). As part of the testing, Lett underwent a sleep study at the clinic the evening of August 23, 2006. (Tr. 1, 8:24-25, 9:1-2). He was given a mild sleeping pill at approximately 9:00 p.m. and slept through the night. (Tr. 1, 11:14-18, 12:1-3). The next morning, Lett woke up sometime before 6:00 a.m., refreshed and prepared to return to the Naval Air Station in Jacksonville. (Tr. 1, 12:6-12, 24-25, 13:1). Lett proceeded in his rental car onto University Boulevard heading west. (Tr. 1, 16:8-10). There were no street lights on the right side of the road. Instead, the lights were only located on the left side of the street and Lett thought the roadway was dark. (Tr. 1, 15:22-25, 16:1-4). Indeed, Lett testified he was uncomfortable driving the morning of the accident because it was "too dark" on his side of the street. (Tr. 1, 18:8-12). As a result, he slowed down and drove in the right-hand lane. (Tr. 1, 18:13). Lett had his low-beam headlights on. (Tr. 1, 20:2-3). The area of University Boulevard Lett was traveling was a five-lane highway with a turn lane in the center. (Tr. 1, 16:17-19).

---

[1] References to the transcript of the trial will be "Tr., Volume number, Page number : Line number(s)."

-2-

In the moments immediately prior to the accident, Lett testified another vehicle was in the process of passing him. He stated he looked in his rearview mirror and saw bright headlights. (Tr. 1, 26:4-6). He believed the vehicle must have been a larger vehicle, such as a truck, because the headlights were so bright. (Tr. 1, 26:5-6). Lett stated he might have moved his car over to the right to give the other vehicle more room to pass. (Tr. 1, 26:10-12). After looking in his rearview mirror and possibly veering the car to the right, while he was in the process of turning back forward, Lett heard a thud and immediately applied the brakes. (Tr. 1, 26:12-14). On cross-examination, Lett clarified that after he looked in his rearview mirror, he looked ahead and then checked his side-view mirror. (Tr. 1, 39:25, 40:1-2). He stated that while he was in the process of turning back forward from checking the side-view mirror, he heard the sound of something hitting his car. (Tr. 40:3-12).[2]

After Lett realized he hit a person, he called 911, however, he did not know the location of the accident. A witness, Tabitha Woodcock Higgins ("Higgins"), stopped

---

[2] During redirect, counsel for Plaintiff spent much time questioning Lett regarding where he was looking in the moments before hitting Ms. Giter. Counsel pointed to Lett's deposition where Lett responded "yes" to the question: "[i]n the two or three seconds before the impact took place, you heard that sound, were you looking – to the best of your recollection, were you looking ahead of you through the windshield the entire time?" However, later in his deposition, Lett was asked: "[i]n the two, three, or four seconds before the accident took place, do you recall whether or not your attention was diverted away from looking directly through the windshield for any reason?" Lett answered: "[t]o the best of my recollection, I remember a vehicle overtaking me from behind."

While the Court does not believe Lett intentionally changed his story, he was certainly able to provide more detail to what he was doing immediately before the crash upon cross-examination during the trial than he did in the statement he made to police directly after the accident, during his deposition on April 8, 2009, or on direct examination during the trial. In any event, the Court finds credible the explanation that at some point in the seconds before the accident, Lett noticed his car was being overtaken by another car from behind. It is also reasonable to conclude that he looked in his rearview mirror and then in his side-view mirror at some point while the other car was passing him.

once she observed that a pedestrian had been struck.  Higgins was able to tell 911 the location of the accident.  (Tr. 1, 207:8-20).  Higgins did not see the accident take place.  Instead, she testified that the morning of the accident, she was working at Huddle House, a restaurant located on University Boulevard near where the accident occurred.  (Tr. 1, 180:11-18).  Her shift ended at 5:30 or 5:45 a.m. and afterwards, she and her boyfriend had some coffee before heading home.  (Tr. 1, 180:16-22).  Higgins and her boyfriend noticed Lett's vehicle as they were leaving the Huddle House because the boyfriend commented that it was the same kind of car he was interested in purchasing.  (Tr. 1, 181:9-16).  After they entered their vehicle and began driving on University Boulevard, they observed Lett's vehicle abruptly slam on the brakes.  (Tr. 1, 182:1-6).  Sometime in the moments preceding the accident, they also observed a large vehicle ahead of them in the process of passing Lett's vehicle.  (Tr. 1, 182:18-25).  Higgins remembered it was a large vehicle because she made the comment about it to her boyfriend, "we can buy you something big enough to take up a whole lane like that one is."  (Tr. 1, 204:18-22).

Higgins also testified she drove the stretch of University Boulevard where the accident took place on a regular basis, as it was the route she took to get home.  (Tr. 1, 179:18-20).  Higgins stated that particular roadway was "extremely dark."  (Tr. 1, 184:2-4).  She further testified the other side of the street had street lights and that "sometimes the lights worked and sometimes they didn't."  (Tr. 1, 183:16-22). The side of the street where the accident occurred was where all the businesses were located; it did not have any street lights and as the businesses were not open at that hour, no lights were on.

(Tr. 1, 183:19-24). Higgins was shown some photographs of the area utilized by Plaintiff's expert witness. She claimed the photographs did not accurately depict the scene of the accident on the morning of the accident because several of the businesses had their lights on whereas on the morning of the accident, they did not. (Tr. 1, 185:45, 186:4-25, 187:1-9).

Plaintiff presented the testimony of Walter Kennedy ("Kennedy"), a forensic traffic reconstruction specialist. (Tr. 1, 57:14-15). Kennedy testified he visited the scene of the accident and took light measurements to determine the amount of ambient lighting. (Tr. 1, 66:18-25, 67:1-7, 68:3-6). Kennedy took the measurements on two different occasions, September 12, 2008 and April 23, 2009. (Tr. 1, 99:13-16). Kennedy explained that lighting levels are measured in "foot-candles" and that .3 foot-candles is considered the minimum amount of lighting required to conduct outside activities without needing additional artificial lighting. (Tr. 1, 64:22-25, 65:1-5, 101:9-23). In other words, according to Kennedy, if you have more than .3 foot-candles of illumination on an object, it is "there to be seen." (Tr. 1, 102:7-16). Based on his findings, Kennedy determined Lett's vehicle was 674 feet away from the point of impact when Ms. Giter entered his lane of traffic and therefore, entered a location where there was enough illumination for her to be seen by Lett. (Tr. 1, 72:8-13). According to Kennedy, this finding meant Ms. Giter was "there to be seen" for twelve seconds before the impact. (Tr. 1, 165:8-23).

Kennedy reached this conclusion by utilizing the speed of Lett's vehicle, thirty-eight miles per hour, and an estimated walking speed for Ms. Giter of half a foot per

second.³  (Tr. 1, 72:8-10).  At the speed he was traveling and using a perception reaction time of two and a half seconds, Kennedy determined it would have taken Lett 209 feet to stop his car.  (Tr. 1, 72:16-17, 78:2-4, 115:24-25).  Using a perception reaction time of two seconds, it would have taken 180 feet to stop the car.⁴  (Tr. 1, 115:21-25, 116:1). On cross-examination, Kennedy acknowledged he determined it would have taken Lett 4.9 seconds to react and bring his vehicle to a stop.  (Tr. 1, 175:16-19).  Accordingly, of the twelve seconds Ms. Giter was there to be seen, Kennedy determined Lett had about eight seconds to see Ms. Giter and apply the brakes before hitting her.  (Tr. 1, 78:11-23).

Defendant's expert, Dr. Robert Sugarman, Ph.D. ("Sugarman"), an expert in human factors and experimental psychology, testified he did not believe Ms. Giter was there to be seen by Lett.  Sugarman explained that there are many factors which can affect a driver's ability to detect a pedestrian beyond simply whether or not there is enough illumination upon the pedestrian.  (Tr. 2, 10:11-13).  Specifically, Sugarman stated the most critical factors in visual detection are brightness contrast and the general level of brightness itself.  (Tr. 2, 10:14-18).  Brightness contrast is the "brightness of the thing you're looking at compared to the brightness of its surround, the background."  (Tr. 2, 10:18-20).  Additionally, Sugarman noted other important factors in

---

³ Kennedy came up with Ms. Giter's walking speed by relying on information provided by the family.  (Tr. 1, 77:5-11, 152:4-10).  He asked that the family pace a ten-foot space trying to mimic Ms. Giter's gait and time it.  (Tr. 1, 77:5-11).  He then took those times and averaged them to arrive at a pace of half a foot per second.  (Tr. 1, 77:11-14).

⁴ Based on the Court's findings regarding the level of illumination at the scene (see infra p.11), the undersigned finds a reaction time of two and a half seconds to be more appropriate.

visual detection include expectancy, whether you expect something to be there or not and motion, whether the object is moving. (Tr. 2, 11:3-11). Sugarman also explained there is a difference between the illumination, the light coming down and striking something, and the luminous, the light coming off the object itself. (Tr. 2, 17:17-19). As such, a dark object and a light object could have the same illumination, however, the light object would have more brightness and would be easier to see than the dark object. (Tr. 2, 17:20-25, 18:1-2). Sugarman concluded because there was a low level of illumination that was at right angles to Ms. Giter and therefore, very little of the illumination was falling on a part of her body that Lett could see, and because Ms. Giter was wearing clothing that was a medium level in terms of brightness, the "brightness and the brightness contrast would be and certainly could be much too low for a driver to be able to see while scanning the road as they normally do looking around for things, especially other vehicles, to be able to see that there might be a person there." (Tr. 2, 20:20-25, 21:7-12).

On cross examination, Sugarman confirmed that in his report, he cited to a study which found that using the regular low-beam headlights of a car, the detection distance for a person dressed in light gray clothing would be from 200 to 300 feet. (Tr. 2, 45:17-22). Additionally, in his report Sugarman determined using a walking speed of three feet per second, Ms. Giter would be illuminated by the headlights for a period of two

seconds and utilizing a walking speed of two feet per second, she would be illuminated for a period of three seconds. (Tr. 2, 47:17-25, 18:1).[5]

### III. Conclusions of Law

The Court has jurisdiction over this lawsuit pursuant to the Federal Torts Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b) and 2671 et seq. The FTCA presents a limited waiver of sovereign immunity of the United States with respect to "claims. . . for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant . . ." 28 U.S.C. § 1346(b)(1). Suits brought under the FTCA are governed by the "the law of the place where the act or omission occurred." Id. Accordingly, this wrongful death action is governed by Florida law.

Under Florida law, Plaintiff may recover if he can demonstrate the United States, acting through Lett, was negligent. To establish negligence, four elements must be shown: (1) duty of care, (2) breach of that duty, (3) causation, and (4) damages. Jeffries v. Amery Leasing, Inc., 698 So.2d 368, 370-71 (Fla. 5th Dist. Ct. App. 1997). If Plaintiff establishes each of these elements, the Court will also consider Ms. Giter's negligence because under Florida law, the doctrine of comparative negligence applies, which allows a court to apportion liability between a negligent defendant and a negligent

---

[5] Neither expert was able to conclusively determine from which direction Ms. Giter entered the street. (Tr. 1, 90:21-25, 91:1-10; 2, 24:12-17).

plaintiff.  See Hoffman v. Jones, 280 So.2d 431, 438 (Fla. 1973).  Plaintiff bears the burden of proving fault on the part of Lett by a preponderance of the evidence and likewise, Defendant has the burden of proving any negligence on the part of Ms. Giter by a preponderance of the evidence.

In Florida, drivers have a duty to maintain a proper lookout at all times and a duty to "exercise due care to avoid colliding with any pedestrian . . . and give warning when necessary."  Nelson v. Ziegler, 89 So.2d 780, 783 (Fla. 1956); Fla. Stat. § 316.130(15). Similarly, under Florida law, pedestrians have the following duties: (1) "[w]here sidewalks are provided, no pedestrian shall, unless required by other circumstances, walk along and upon the portion of a roadway paved for vehicular traffic;" (2) "[n]o pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield;" (3) "[e]very pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway;" (4) "[b]etween adjacent intersections at which traffic control signals are in operation, pedestrians shall not cross at any place except in a marked crosswalk;" and (5) "[n]o pedestrian shall, except in a marked crosswalk, cross a roadway at any other place than by a route at right angles to the curb or by the shortest route to the opposite curb."  Fla. Stat. § 316.130(3), (8), (10), (11), and (12). Accordingly, both Lett and Ms. Giter had statutory duties of care.

As for breach of those duties, Plaintiff contends Lett breached his duty of keeping a proper lookout at all times.  Plaintiff's expert, Kennedy, testified based on the lighting

conditions on University Boulevard at the time of the accident, Ms. Giter was "there to be seen" for a period of six (6) to twelve (12) seconds. (Tr. 1, 165:18-25, 166:1). Accordingly, Plaintiff argues, had Lett been maintaining a proper lookout, he would have had ample time to avoid hitting Ms. Giter. Defendant, on the other hand, presented expert testimony from Sugarman to the effect that based on the conditions at the time of the accident, it was not unreasonable for Lett to fail to see Ms. Giter before hitting her.

While the Court finds Plaintiff's expert's testimony persuasive, it has some reservations regarding some of the assumptions Kennedy made. For example, the Court is not satisfied Ms. Giter's walking speed was half a foot per second. As Sugarman testified, a person walking at that speed would take two minutes to cross University Boulevard. (Tr. 2, 23:11-13). The evidence revealed Ms. Giter would routinely take the bus to work. The Court does not believe an individual who was only able to walk a half a foot per second would routinely walk to a bus stop approximately a quarter of a mile from her home[6] and which required her to cross a busy street. Even Kennedy testified such a walking speed was extremely slow. (Tr. 1,77:15-17). Therefore, the Court believes a more appropriate walking speed would be two feet per second. Sugarman testified a walking speed of three feet per second was the fifteenth percentile for individuals over the age of sixty-five, meaning that only fifteen percent of people walked slower. (Tr. 2, 22-25, 23:1). As that speed did not take into consideration an individual with a limitation, and the evidence revealed Ms. Giter had

---

[6] Sugarman testified that the bus stop was approximately a quarter mile from Plaintiff's home. (Tr. 2, 22:3-5).

problems with her legs, the Court finds a walking speed of two feet per second to be a more reasonable assumption for Ms. Giter's pace. According to Kennedy, if Ms. Giter had a walking speed of two feet per second, she would have been "there to be seen" for a period of six seconds. (Tr. 1, 165:13-20).

Additionally, the Court is concerned with the light measurements taken by Kennedy. There was evidence presented which indicated some of the illuminated business signs may have changed since the date of the accident. Kennedy took his light measurements on September 12, 2008 and April 23, 2009, more than two years after the accident took place. (Tr. 1, 99:13-16). During her testimony, Higgins was shown the photographs utilized by Plaintiff's expert. Higgins testified several of the signs illuminated on the day the photo was taken were not illuminated or did not exist at the time of the accident. (Tr. 1, 185:45, 186:4-25, 187:1-9). The testimony from both Lett and Higgins, an uninterested witness, was that the road was extremely dark the morning of the crash. (Tr. 1, 18:8-12, 184:2-4). As the Court believes it is proper to discount the light measurements taken by Kennedy as not being representative of the scene of the accident at the time of the accident, the Court credits the unrefuted testimony of both Lett and Higgins, the only two witnesses who were actually at the scene of the accident when it occurred, that the street where the accident took place was very dark.

The Court is also persuaded by the other factors addressed by Defendant's expert, Sugarman, such as brightness, brightness contrast, and expectancy. Even Kennedy admitted that more than illumination goes into whether an object can be

detected by a driver. He admitted that brightness, brightness contrast, expectation, and motion are all factors which determine whether an object can be detected by a driver. (Tr. 1, 124:19-25, 125:1-17).

Finally, the fact Lett never saw Plaintiff has been a troubling issue for the Court. On the one hand, the Court believes this is evidence of Lett's inattentiveness and therefore, negligence. On the other hand, it certainly goes against Kennedy's opinion that Ms. Giter was there to be seen for a period of six to twelve seconds. The Court cannot imagine Lett failed to keep a proper lookout for that length of time. Indeed, when asked by the Court whether it was possible to be distracted for six to twelve seconds and still maintain control of a vehicle, Kennedy answered "no." (Tr. 1, 166:17-19). Kennedy explained in order to stay in his lane of travel, a driver would necessarily have to spend time looking forward during the six to twelve second period and as Lett did not leave his lane of travel, "at some point he was looking forward." (Tr. 1, 166:21-25, 167:1-6).

Based on the foregoing, including the Court's finding it was extremely dark on University Boulevard at the location of the accident and the fact Ms. Giter was wearing low reflective clothing in the street outside of a crosswalk, where Lett would have no expectation of a pedestrian, the Court is convinced Ms. Giter was not detectable by Lett for a total of six seconds. Instead, the Court finds it more reasonable to conclude Lett could not have detected Ms. Giter until the time when she was illuminated by his headlights. In his report, Sugarman opined that given a walking speed of two feet per second, Ms. Giter was illuminated by Lett's headlights for a period of three seconds.

(Tr. 2, 47:17-25, 18:1). Accordingly, the Court finds Ms. Giter was detectable by Lett for a period of three seconds prior to the accident.

During the three seconds in which Ms. Giter was illuminated by his headlights, Lett did not see her. He testified he never saw Ms. Giter until he stopped his car and observed her lying on the roadway. This leads the Court to believe Lett failed to keep a proper lookout. While Lett testified he noticed a vehicle approaching behind him at a high rate of speed and he checked his mirrors to make sure he was out of the way of the vehicle, the Court does not believe it was reasonable for Lett to be so distracted that he was failing to look where he was going for a full three seconds.[7] Therefore, the Court finds Lett was not keeping a proper lookout at the time of the accident and therefore, breached his duty to do so.

A finding of breach of a duty of care on the part of a defendant, however, does not establish a right to recovery by the plaintiff unless the plaintiff can also show causation and damages. See e.g. Jeffries, 698 So.2d at 370-71 (the plaintiff bears the burden of proving by the greater weight of evidence all four elements of negligence - - duty of care, breach of that duty, causation, and damages); see also Gooding v. University Hospital Building, Inc., 445 So.2d 1015, 1018 (Fla. 1984) (failure to establish causation precluded relief); Greene v. Flewelling, 366 So.2d 777, 780 (Fla. 2nd Dist. Ct. App. 1979) (same). In the instant case, the Court finds Plaintiff failed to meet his burden of showing causation. Even assuming Lett was negligent in failing to observe

---

[7] Plaintiff's expert testified that looking in a car mirror should take no more than one second. (Tr. 1, 130:21-25, 131:1-2).

Ms. Giter during the three second window where she was visible to him, Sugarman noted in his report that this period of time was not sufficient for Lett to avoid the accident, as Kennedy had already calculated such would take 4.9 seconds. (Sugarman Report, p.4). Accordingly, because of his rate of speed and the necessary perception reaction time, the Court finds Lett could not have avoided the accident.

Of course, this finding begs the question of whether Lett could have swerved to avoid the collision or had he applied his brakes at some point during the three seconds, slowed the car to a speed where he would not have thrown Ms. Giter into the air. However, neither side presented any evidence regarding these two scenarios. Indeed, the evidence tended to show that swerving to avoid Ms. Giter may not have been possible as there was another vehicle passing Lett's vehicle at some time immediately prior to the collision. As for whether a reduction in speed would have resulted in a far less injurious collision, the Court is left to speculate. Gooding, 445 So.2d at 1018 ("'A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.'") (quoting William L. Prosser, The Law of Torts § 41 (4th Ed. 1971)). As such, Plaintiff has failed to carry his burden of demonstrating that Lett's negligence was the legal cause of the accident. See Fidler v. Koster, 603 N.W.2d 165, 170 (Neb. Ct. App. 1999) (directed verdict proper for defendant where defendant's negligence in failing to see Plaintiff step from curb was not the proximate cause of accident because even if defendant had seen plaintiff step from curb, defendant could not have avoided the accident); Smith ex rel. Smith v.

Kinsey, 858 N.Y.S.2d 495, 497 (N.Y. App. 4th Div. 2008) (denying plaintiff's motion for summary judgment as there was evidence that even if defendant was negligent in dividing his attention between the road and a DVD player, issues of fact remained as to whether defendant's actions were a proximate cause of the accident because there was evidence defendant had the right of way and it was impossible for defendant to avoid the collision).

### IV. Court's Decision

Based upon these findings of fact and conclusions of law, the Court finds in favor of Defendant and against Plaintiff on Plaintiff's claim of negligence. While the Court is very sympathetic to the loss suffered by Plaintiff, it cannot be swayed by sympathy. Instead, it must impartially determine the facts and apply the law. The undersigned has endeavored to do so and the impartial evaluation of the evidence reveals Plaintiff has failed to prove by a preponderance of the evidence that Defendant's negligence was the proximate cause of the accident in which Plaintiff's mother was killed.

The Clerk is directed to enter judgment in favor of Defendant and thereafter, to close the file.

**DONE AND ORDERED** at Jacksonville, Florida this  25th  day of January, 2010.

*Monte C. Richardson*
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record